# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

LUCIA GUARINO,

                              Plaintiff,

            -vs-                                    AMENDED DECISION &
                                                         ORDER
ST. JOHN FISHER COLLEGE,                          06-CV-6251-CJS

                              Defendant.

## APPEARANCES

For Plaintiff:                    Christina A. Agola, Esq.
                                  730 First Federal Plaza
                                  28 East Main Street
                                  Rochester, NY 14614
                                  (585) 262-3320


For Defendant:                    Marion Blankopf, Esq.
                                  Nixon Peabody LLP
                                  Clinton Square
                                  P.O. Box 31051
                                  Rochester, NY 14603
                                  (585) 263-1000

## INTRODUCTION

**Siragusa, J.** This Title VII and New York employment discrimination case is before

the Court on Defendant's motion (Docket No. 34)  for reconsideration pursuant to Federal

Rule of Civil Procedure 59 or 60. The Court grants Defendant's application for reconsidera-

tion and vacates its previously-issued Decision and Order (Docket No. 30), dated March

28, 2008. Upon reconsideration, the Court grants Defendant's motion ([Docket No. 18](#)) to dismiss for the reasons stated below.[1]

## FACTUAL BACKGROUND

The following factual background is taken from the parties' statements of fact required to be filed in a summary judgment motion is pursuant to the local rule:

RULE 56.1

STATEMENTS OF FACTS ON MOTION FOR SUMMARY JUDGMENT

(a) Upon any motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a separate, *short, and concise* statement of the *material facts* as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)….

W.D.N.Y. Local Rule of Civil Procedure 56.1(b) (2003) (emphasis added). The purpose of subdivision (d) is to comply with the basic rule of summary judgment, that factual assertions be supported by evidentiary proof in admissible form. *See Holtz v. Rockefeller*

---

[1]Although Plaintiff has filed a Notice of Appeal, this Court is not divested of jurisdiction to consider and decide a motion made under either Rule 59 or 60. Fed. R. App. P. 4(a)(4).

& *Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) ("a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."). Defendant, in support of its motion for summary judgment, and in accordance with Local Rule 56.1(b), submitted a short and concise statement of the material facts, consisting of 12 pages, supported by citations to admissible evidence. For reasons inexplicable to the Court, Plaintiff, in response to Defendant's statement of facts, submitted two documents. First, although the "opposing party," in contravention of Local Rule 56.1(b), she submitted her own statement of facts consisting of 151 pages, not limited to "material facts as to which it is contended that there exists a genuine issue to be tried." Second, she submitted what she captioned "Response to Defendant's Local Rule 56.1 Statement," which, at 187 pages, is anything but short and concise. Moreover, with respect to this second document, while Plaintiff controverts certain of Defendant's factual averments, she fails to cite "evidence which would be admissible" in support of her position, as required by Local Rule 56.1(d). Rather, by way of opposition, she often repeats wholesale, and sometimes verbatim, the arguments made in her memorandum of law.[2] Where this has occurred, the Court, in accordance with Local Rule 56.1(c), has deemed Defendant's factual assertion admitted. However, the Court is mindful of its duty to view the evidentiary proof in admissible form in the light most favorable to Plaintiff as the non-moving party, and accord Plaintiff all reasonable inferences to be drawn from such proof.

---

[2]The obvious objective of Local Rule 56.1 is to facilitate the Court's resolution of summary judgment applications. However, Plaintiff's blatant disregard of the "short and concise" requirement of Local Rule 56.1 and her submission, instead, of 338 pages in response to Defendant's 12-page statement of facts, has had the opposite effect and subverted the Rule's purpose.

Plaintiff Lucia Guarino is a tenured faculty member at St. John Fisher College ("Fisher") in Pittsford, New York. She has held a faculty position in Fisher's School of Education since July 2004. Plaintiff first began working for Fisher as a part-time adjunct professor in 1998. She was hired as a full-time faculty member effective August 2000.

Dr. Carol Freeman is a tenured faculty member at Fisher and began working for the college in 1997. Since 2001, she has been the Chair of the Department of Mathematical and Computing Sciences ("MCS Department"). As such, Dr. Freeman was responsible for designing, developing, and directing the graduate program within the MCS Department known as the Graduate Mathematics, Science, Technology education program ("GMST"). GMST focuses on preparing graduate students to teach and to obtain their teacher certification in math, science and technology subjects at the kindergarten through grade 12 level. GMST was approved by New York State and opened in 1998. Dr. Freeman remained the GMST Director until August 2005.

In 1998, Dr. Freeman invited Plaintiff to apply for an adjunct teaching position in GMST, and in 2000, she recommended Plaintiff be hired for a full-time, temporary faculty position. Subsequently, in 2003, upon Dr. Freeman's recommendation, Plaintiff received a regular position, which placed her on track for tenure. Up until the time she left GMST in July 2004, Plaintiff was the only faculty member devoted full-time to the program. During the period in which Plaintiff worked in the GMST Program, Dr. Freeman was her supervisor.

Although Plaintiff's field of expertise was science education, she also had a background in other education areas, such as instruction and inquiry. Dr. Freeman relied heavily on Plaintiff to assist her with developing and administering the GMST program and

hoped that Plaintiff would ultimately take over her position as GMST Director. On May 8, 2004, Dr. Freeman in fact offered Plaintiff the position of GMST Director.

Dr. Freeman involved Plaintiff in all aspects of GMST, including academic, administrative, and personnel issues. Plaintiff attended meetings with Dr. Freeman concerning GMST and other Fisher matters, and they communicated in-person, by telephone and e-mail concerning work-related issues. Dr. Freeman believed that the meetings and discussions were useful or necessary for Plaintiff, as well as for the resolution of Fisher business. Other MCS Department faculty, male and female, did not have the same responsibilities for GMST as did Plaintiff.

Plaintiff at times worked from her home and on such occasions, Dr. Freeman telephoned or e-mailed her to discuss work-related matters. Dr. Freeman did not call her at home to discuss personal matters.

Dr. Freeman told MCS Department members, both male and female, including Plaintiff, that they meant a lot to her and were very important to her. Defendant contends that Dr. Freeman made such statements to individuals, including Plaintiff, whom she valued highly for their hard work and contributions to the MCS Department. Further, Defendant contends that because of her regard for their work, Dr. Freeman told both male and female MCS Department members that she did not want them to leave her, meaning her department. Dr. Freeman intended the statements as compliments. While Plaintiff, maintains that when Dr. Freeman made such statements to her, they were personal in nature, she testified at her deposition as follows:

A:      It was completely irrational. So my understanding was I was dealing
        with some kind of upset crazy person who wanted me to be part of

her work life for eternity or something and couldn't do without me. That was my understanding. And it was nuts.

Q:      So she was referring to your leaving the job?

A:      Yes, leaving her.

Q:      Leaving her department?

A:      Yes, leaving—going somewhere else, leaving her.

(Guarino Dep. 161.)

Dr. Freeman is a married, heterosexual female. She has never made any explicitly sexual remarks or romantic statements to Plaintiff, nor has she ever touched her in any fashion, or indicated that she wanted to touch her.

In May 2004, Plaintiff informed Dr. Freeman that she intended to resign from GMST and apply for a position in Fisher's School of Education, where all of Fisher's teacher certification programs, other than GMST, are located. No other faculty member, male or female, had ever resigned from the MCS Department to switch to another Fisher school as Plaintiff did. Dr. Freeman was unhappy about Plaintiff's transfer for the following reasons: losing the faculty member that she had hoped would relieve her of the GMST program responsibilities; the time and effort she had put into integrating Plaintiff into the many aspects of GMST; concern over whether her MCS Department would be allowed to keep the full-time, tenure track budget line that Plaintiff was going to vacate; and concern about covering Plaintiff's teaching load if she left immediately.

In August of 2004, Plaintiff was in fact hired by the School of Education at which time she became the Chair of the Department of Adolescent Education. She officially

resigned from the MCS Department in July 2004 and thereafter Dr. Freeman was no longer Plaintiff's supervisor.

Shortly after her resignation from the MCS Department, Plaintiff submitted a proposal to Dr. Freeman which purported to set out ways in which Plaintiff could still collaborate with GMST. In that regard, Plaintiff proposed to mentor the MCS Department's new GMST faculty member, Dr. Diane Barrett. Plaintiff also proposed that she be allowed to teach a specific GMST course in fall of 2004. However, the course she suggested was not one that she had been scheduled to teach before she left the MCS Department. Nonetheless, Dr. Freeman agreed Plaintiff could teach GMST-502 in the fall of 2004. In response, Plaintiff informed Dr. Freeman that she would not teach any GMST courses, but then decided to co-teach a research course in the GMST program with Dr. Barrett in the fall of 2004. Thereafter, in the spring of 2006, Plaintiff taught a cross-listed MCS Department/Education course.

Plaintiff has not met with Dr. Freeman since July 2004, and has not spoken or received communications from her in any form since August 15, 2005.[3] Moreover, between August 2004 and March 2005, Plaintiff rarely saw Dr. Freeman. In regard to any contact with Dr. Freeman after she left GMST, Plaintiff testified at her deposition as follows:

> Q:   After you moved to the School of Education in July 2004, how often did you see Carol [Freeman]?
>
> A:   Very infrequently. Maybe once a—in the beginning, a couple of times a month and as time went on, I refused to meet with her any longer. I wasn't going to do that to myself any longer.

---

[3]While Defendant maintains that they have not communicated since September 2005, Plaintiff objects that communications ceased in August of 2005, even earlier than Defendant thought.

Q:      When you met with Carol [Freeman] about two times a month, were
        any of these meetings with you and Carol alone?

A:      I cannot remember.

Q:      Can you remember any time after July 2004 the two spoken to Carol
        [Freeman] alone in person?

A:      No.

Q:      After July 2004, did you have any telephone conversations with Carol
        [Freeman] in which you two were the only parties?

A:      I don't recall. Messages I do recall. Talking—maybe once. One time
        but I don't remember any of the details.

(Guarino Dep. 83.) Dr. Freeman was on sabbatical during the spring 2005 semester and,

consequently, she only came to the Fisher campus occasionally during this time. In fact,

beginning in May of 2005, she was out of the country all together for six weeks.

After Plaintiff left the GMST program and MCS Department, she and Dr. Freeman

remained co-administrators of a grant known as the Teacher Leader Quality Partnership

("TLQP") grant. This grant funds workshops with local schoolteachers for the purpose of

"designing, developing, and implementing a model of student-centered classroom

instruction." In 2005, Dr. Freeman and Plaintiff had disagreements about Plaintiff's

administration of the grant. In March 2005, Dr. Freeman and Plaintiff disagreed about

whether Plaintiff would be able to work on the following years' (2005-2006) TLQP grant.

Dr. Freeman told Plaintiff that if Plaintiff did not want to resign from the 2005-2006 TLQP

grant, then Dr. Freeman was willing to resign. She told Plaintiff she would accept Plaintiff's

choice on this matter. Plaintiff informed Dr. Freeman that she wanted to take over the

2005-2006 TLQP grant herself, and Dr. Freeman resigned as co-administrator from the 2005-2006 TLQP grant.

In August 2005, Plaintiff wanted to transfer certain grant funds from one line to another in the current year's (2004-2005) TLQP budget. At that time, Dr. Freeman was still co-administrator of the current year's grant. Dr. Freeman asked Plaintiff to explain why the funds transfer was necessary, but Plaintiff refused to answer Dr. Freeman. Regarding the proposed transfer, Plaintiff testified at her deposition as follows:

> Q:   Okay. This is an [e]-mail from [Dr.] Dave Pate to you and Carol [Freeman] and Beth Lavigne?
>
> A:   Yes. Okay. Veronica Skinner, page 64. The bottom. Veronica had written as to me because I was asking her about transferring the money. "Yes, it's permissible to transfer the funds if the amount transferred"—"for your convenience, I'm attaching a copy of the form." Okay. I knew that it was permissible to do this, and Carol thought that it wasn't.
>
> Q:   Did she ever say it wasn't permissible to do it?
>
> A:   She—
>
> Q:   If you stick with the page—
>
> A:   In the past she did not do it. They sent the money back.
>
> Q:   So this was not what she did as a grant administrator?
>
> A:   Right.
>
> Q:   So she was asking the question as stated on page 64, "Why is it necessary to transfer funds," correct?
>
> A:   Mm-hmm. It was a challenge. I saw that as a challenge. "Why is it necessary to transfer funds?" In dealing with the grant, you have this—you have money and how she put—the grant ended—"Why is

it necessary"—see, to me, as I look at this, "Why is it necessary to transfer funds?" The grant activities ended May 2005. All of them paid and there was money left to pay all the bills that it was dealt with [sic].

Q:     At this time was Carol [Freeman] still officially one of the administra-tors of the TLQP grant; August of 2005?

A:     Yes, she was.

Q:     So she had to sign off on any changes in the budget; is that correct?

A:     We were co-PIs [sic], so I don't believe that she had to sign off. One of us needed to sign off.

Q:     Were you, as a co-PI, responsible for the activities in the grant?

A:     Yes. I had a preponderance of the work of this nature of the grant.

Q:     Was Carol also responsible for the grant activities as a co-PI?

A:     Yes.

Q:     Wasn't it reasonable for her to be concerned—...—about transfers of funds in the grant if she had no explanation as to why they were being transferred?

A:     This couldn't be done without her knowing why it was done, because there is no way that she would not receive the first FS10A.

Q:     Okay. In your opinion, was it reasonable for Carol to be asking for the purpose of the funds transfer given that she was also a co-administra-tor of the grant?...

A;     Yes.

(Guarino Dep. 52-54.) To resolve the impasse, Dr. Freeman resigned as co-administrator of the 2004-2005 grant.

    In the fall of 2004, after she had left the GMST Program, Plaintiff and a colleague of hers, Chris Green, were walking together to the math faculty lounge. Green observed

Dr. Gerry Wildenberg, Dr. Freeman's husband, who is a mathematics professor at Fisher, walking in their direction. After entering the faculty lounge, Green commented to Plaintiff, in sum and substance, "if Gerry saw you in here, he would have a fit" or "he would go ballistic." (Guarino Dep. 63.) Dr. Wildenberg had no supervisory responsibilities over anyone. (*Id*.) Also in the fall of 2004, Diane Barrett, who, as indicated above, replaced Plaintiff in the GMST Program, told Plaintiff that she felt she might not get the directorship position at GMST and that her tenure might be threatened if Dr. Wildenberg saw them together. (Guarino Dep. 65-66.) Before February of 2005, another colleague of Plaintiff's, Ed Currier, told her that "he was uncomfortable being seen with [her] because he was perceived as having gone over to the dark side." (Guarino Dep. at 72.) Plaintiff related these incidents to Samuel Walton, Dean of the School of Education at Fisher.

On August 15, 2005, Plaintiff met with Fisher's director of human resources, Karen Gagie, at which time she complained[4] of harassment on the part of Dr. Freeman and Dr. Wildenberg. Then on September 8, 2005, she filed a formal written complaint[5] regarding Dr. Freeman and Dr. Wildenberg. Previously, in June of 2002, Plaintiff complained to Dr.

---

[4]Plaintiff described how she "told a very long and tearful story that—about—I told the story of my experience working for Carol Freeman, how it affected me psychologically." (Guarino Dep. 145.)

[5]Plaintiff responded to Defendant's interrogatory question, "[d]escribe in detail all instances in which Plaintiff engaged in protected activity," by stating, "[s]ee Plaintiff['s] Response to Defendant's Request for Production of Documents No. 3." (Pl.'s Response to Def.'s First Set of Interrogatories (Jan. 30, 2007) (attached to Blankopf Aff. as Ex. B (Deposition Exhibit 18) at 6.) That interrogatory response was sworn to by Plaintiff on January 30, 2007. (*Id*. at Individual Verification.) Plaintiff's response No. 3 states, "See Exhibit 'C'." (Pl.'s Response to Def.'s First Request for Production of Documents (Jan. 30, 2007) (attached to Blankopf Aff. as Ex. C) at 2.) That response was sworn to by Plaintiff on January 30, 2007. Exhibit C consists of Plaintiff's written complaint, dated September 8, 2005, and addendum, dated September 26, 2005, both addressed to Ms. Gagie. In her written complaint to Ms. Gagie, Plaintiff refers to the August 15, 2005, meeting where she initiated a harassment complaint against Dr. Freeman and her husband.

Donald Bain, then Acting Provost at Fisher, "that my office be moved to another building to put some distance between me and Dr. Freeman." She also related that she "told Dr. Bain that [she] was involved in an unhealthy relationship." (Guarino Dep. 168.) However, she did not explain to Dr. Bain what she meant by an unhealthy relationship.

From 2001 through 2003, Plaintiff also complained about Dr. Freeman several times to Dr. David Pate, an Associate Provost Dean in the School of Arts and Sciences. The nature of Plaintiff's complaints were:

> The usual that you would experience among colleagues that were working on a project that was quite complicated and had a lot of emotions attached with it. And Dr. Freeman and [Plaintiff] and myself, the three of us, did not always see eye to eye or did not always hold the same opinion in terms of the direction in which we should go.

(Pate Dep. 49.)

Plaintiff filed the instant suit in May 2006. Subsequently, in June of 2006, Fisher awarded her tenure.

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). Where the non-moving party

will bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition

to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well-settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### *Title VII*

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]*…because of…sex.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (quoting 42 U.S.C. § 2000e-2(a) (1991)) (emphasis in original). "'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring).)

***New York Human Rights Law***

New York Executive Law § 296 provides in pertinent part as follows:

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1) (2007). The Court notes that the elements of Title VII and New York Executive Law § 296 claims "can be analyzed, for purposes of determining sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998).

***McDonnell Douglas Standard***

Discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and under the Pregnancy Discrimination Act, as well as pregnancy discrimination claims under New York's Human Rights Law are governed by the three–part analytical framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). *See Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 430 (S.D.N.Y. 2000) (applying *McDonnell Douglas* to a PDA claim); *Klausner v. Industrial Risk Insurers, Inc.*, 1999 U.S. Dist. LEXIS 10219, 1999 WL 476285, at *3 (S.D.N.Y. July 8, 1999) (applying *McDonnell Douglas* to N.Y. Human Rights Law claim). Under the *McDonnell Douglas* standard, a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence, (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel*

*Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). To establish that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, a plaintiff may demonstrate that "similarly situated" employees who do not share the plaintiff's protected characteristics were treated preferentially. *Id*.

Requirements for establishing a *prima facie* case are minimal. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998). If a plaintiff is successful in demonstrating her *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non–discriminatory purpose for its adverse employment action. *Id.* at 153 (citing *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792, 802 (1973)). The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin v. Ford Model, Inc.*, 149 F.3d at 153.

Once the employer satisfies its burden, a plaintiff may prevail only if she presents evidence that the employer's proffered reasons are a pretext for discrimination. *Id*. A plaintiff, to demonstrate pretext, must show both that the proffered reason was false and that discrimination was the real reason. *Id*. In applying the *McDonnell Douglas* criteria to a case under the Age Discrimination in Employment Act, the Supreme Court has held that a plaintiff's *prima facie* case, combined with sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Justice O'Connor, writing for a unanimous Court, said, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose." *Id*.; *see also Regional Economic Community Action Program, Inc. v. United States,* 294 F.3d 35, 49 (2d Cir. 2002).

## ANALYSIS

The Court first considers Plaintiff's claim of hostile work environment. While Plaintiff contends that Dr. Freeman subjected her to a hostile work environment based on sex, such position is at odds with her deposition testimony. More specifically, Plaintiff testified at her deposition as follows:

> Q:    Did you consider this [May 8, 2004] e-mail to be Carol showing a romantic interest in you?
>
> A:    *Romantic, no*. Bizarre, yes.
>
> Q:    Did you consider the statements in this e-mail that, quote, "You are so important. I left the grad reception early because it is so hard on me to think that you may leave me" as inappropriate in any way?
>
> A:    Yes.
>
> Q:    Why?
>
> A:    It's so hard on her to think I may leave her? Well, *it wasn't romantic*. It was extraordinarily needy in a very unusual way that I have never, in my I-don't-no-how-many years of professional work, ever saw. Very bizarre, and very—this is getting into really clearly that whole "needy." I don't want to be needed in this way. I don't want my boss crying and freaking out because I'm leaving. It's too bizarre. And yeah, that's the problem. That's the thing that—this really captures in [sic] a nutshell. Weird.
>
> Q:    Did you consider it being needy in a sexual way?
>
> A:    I considered it being needy in...
>
> Q:    Well, maybe I can shorten this by asking, or suggest you answer the question. Did you consider it being needy in a sexual way?

A:    Sexual is so broadly defined. It's hard to me—you know, *I didn't think she wanted my body*, if that's what you mean. But she wanted something. I think it was very, very emotional. Very—this is not normal behavior in the workplace, to need someone as desperately. It was as though I was filling some need of hers that wasn't job-related. And this is where this—this is getting at this perfectly. And that was part of my discomfort.

(Guarino Dep. 193-94 (emphasis added).) She further testified,

Q.    Did Carol ever tell you that she thought women were somehow inferior to men?

A.    No.

Q.    Are you claiming in this lawsuit that Carol treated you badly because you are a woman?

A.    No.

(Guarino Dep. 10-11.) The incidents of harassing conduct Plaintiff describes are all facially neutral. They do not, of themselves, indicate that Dr. Freeman was harassing Plaintiff because of sex. As the Second Circuit wrote in *Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002):

Facially neutral incidents may be included, of course, among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. *Compare Howley*, 217 F.3d at 155-56 (holding that fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements), *and Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-64 (6th Cir. 1999) (where plaintiff was ostracized on multiple occasions, the use of sex-specific slurs in some incidents justified the inference that all of the incidents were sex-based, allowing the facially neutral incidents to be considered in hostile work environment analysis), *with Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (objectionable but facially sex-neutral behavior by one person could not be considered in hostile work environment claim where there was no evidence of that person's bias).

*Alfano*, 294 F.3d at 378. As indicated above, Plaintiff did not consider Dr. Freeman's conduct to be "romantic" in nature, but rather "bizarre." However, the Court is unaware of any federal cause of action for "bizarre" behavior on the part of a supervisor that, as is the case here, is not "*discrimina*[*tion*]… because of…sex." *Oncale*, 523 U.S. at 80.The Court determines that Defendant has met its burden to demonstrate that the evidence creates no genuine issue of material fact and that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the Plaintiff's burden of proof at trial. In that regard, Plaintiff's evidence fails to even meet the low threshold of a *prima facie* case of sex discrimination based on hostile work environment.

Turning now to Plaintiff's claim of retaliation, the Court likewise concludes that it is without merit. The retaliatory conduct of which Plaintiff complains all occurred prior to her August 15, 2005, meeting with the Director of Human Resources in which she brought her perceived discrimination to Fisher's attention. Even assuming, *argundo*, Plaintiff's complaints to Dr. Bain, Dr. Pate, and Dr. Walton are chargeable to Fisher because they were made to "a supervisor with immediate or successively higher authority over a plaintiff," *Hill v. Dayboy-Braustein*, 467 F. Supp. 2d 336, 359 (S.D.N.Y. 2006), and even assuming *arguendo*, despite her deposition testimony, that she reasonably believed such complaints amounted to "protected activity" based upon sex, her retaliation claim nonetheless fails. It is, of course, well settled that Title VII's "anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern & Santa Fe Ry. v. White*, __ U.S.__, 126 S. Ct. 2405, 2412-13 ( 2006). In that regard, as the Second Circuit explained in *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006):

Observing that Title VII's primary goal is to promote "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status," the Court pointed out that "[t]he anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id*. [*White*, 126 S.Ct.] at 2412. The Court reasoned that the means by which an employer can retaliate against an employee are not limited to altering his compensation, terms, conditions, or privileges of employment, and that

> [a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's primary purpose, namely, [m]aintaining unfettered access to statutory remedial mechanisms. . . .

> Thus, purpose reinforces what language already indicates, namely, that *the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment*.

*Kessler*, 461 F.3d at 208 (quoting *White*, 126 S.Ct. at 2412-13 (internal quotation marks omitted) (emphasis added)).

Here, however, Plaintiff has failed to establish, "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *White*, 126 S. Ct. at 2415 ( 2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006, quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  While Plaintiff appears to alleges that she was "compelled" to resign from GMST, this is not supported by the evidentiary proof in admissible form. To the contrary, the proof establishes that she resigned from GMST in favor of a position as a department chair in the School of Education, which she was granted, despite Dr. Freeman's opposition. Further, she was allowed to teach a course in GMST, again over

Dr. Freeman's objection. Moreover, to the extent Plaintiff complains about administration of the TLQP grant, it is undisputed that Dr. Freeman resigned her position as co-administrator of the 2004-2005 grant, as well as the 2005-2006 grant, leaving Plaintiff in charge as to both.  Finally, there is no dispute that subsequent to her resignation from GMST, Plaintiff was granted tenure by Defendant.

## CONCLUSION

Defendant's motion (Docket No. 18) for summary judgment is granted. The Clerk is directed to enter judgment for Defendant.

IT IS SO ORDERED.

Dated:   April 15, 2008
             Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge